UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

EKO BRANDS, LLC,

                    Plaintiff,

        v.

ADRIAN RIVERA MAYNEZ
ENTERPRISES, INC.; and ADRIAN
RIVERA,

                    Defendants.

C17-894 TSZ

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

THIS MATTER came on for trial on September 16, 2019, before the Court, sitting

with an advisory jury.[1]  Plaintiff Eko Brands, LLC was represented by David Lowe and

Lawrence Graham of Lowe Graham Jones PLLC.  Defendants Adrian Rivera Maynez

Enterprises, Inc. and Adrian Rivera were represented by Kenneth R. Davis II of Lane

Powell PC.  Trial proceeded for four days and ended on September 19, 2019, at which

---

[1] By Minute Order entered September 16, 2019, docket no. 119, the Court directed plaintiff to
show cause why it should not be sanctioned for failing to make mandatory disclosures in
discovery concerning the actual damages it sought in this action.  In response, after the first day
of trial, plaintiff withdrew its claim for actual damages, _see_ Pla.'s Resp. at 4 (docket no. 120),
leaving only plaintiff's claims for equitable relief.  Because a jury had already been impaneled,
the Court decided to proceed under Federal Rule of Civil Procedure 39(c), and treat any verdict
as advisory.  The Court is "at liberty to accept or reject the advisory verdict." _Chicago & N.W._
_Ry. Co. v. Minn. Transfer Ry. Co._, 371 F.2d 129, 130 (8th Cir. 1967); _see Reachi v. Edmond_, 277
F.2d 850, 854 (9th Cir. 1960) (an advisory jury's verdict is "not binding upon the trial court").

time the advisory jury began deliberations. At the end of the day on September 20, 2019, the advisory jury rendered a partial verdict, docket no. 136.

Having considered the advisory jury's partial verdict, the testimony of the witnesses,[2] the exhibits admitted into evidence,[3] the facts on which the parties have agreed,[4] and the oral and written arguments of counsel, including defendants' motion for judgment, docket no. 125, plaintiff's response, docket no. 146, defendants' reply in support of their motion for judgment, docket no. 147, plaintiff's proposed findings of fact and conclusions of law, docket no. 144, defendants' objections, docket no. 145, and plaintiff's response to such objections, docket no. 148, the Court now ENTERS these Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). Any conclusion of law misidentified as a finding of fact shall be deemed a conclusion of law, and any finding of fact misidentified as a conclusion of law shall be deemed a finding of fact.

The Court TREATS defendants' motion for judgment pursuant to Federal Rule of Civil Procedure 50, docket no. 125, as a motion for judgment pursuant to Federal Rule

---

[2] The following individuals testified at trial: Catherine Carr, Dino Ditta, Christopher Legler, Jim Peterson, Adrian Rivera, and Laura Sommers.

[3] Plaintiff's Exhibits 1-17, 19, 21, 23, 29-45, 47-51, 53-54, 57, 59-60, 63-64, 67-71, 74, 77-78, 83-84, 89-95, 97-100, 102-120, 123-127, 130, 134-138, 141-142, 146-147, 149-156, 159-160, 162, and 164-175, as well as defendants' Exhibits 203, 206-207, 209, 225, 229, 231, 241-242, 249-250, 255-260, 264-266, 273-275, 280, 288-293, 298, 300, 303-304, 309-310, 363-365, 367, 369-370, 373-374, 381, 384-385, 387, 389, 392-393, 457-459, 461-462, 464, 466, 473, 479-480, 498, 507-510, and 514, were admitted into evidence. Exhibits 176-178 and 511-512 were admitted for demonstrative purposes.

[4] *See* Pretrial Order at § D (docket nos. 105 & 106); Court's Instruction No. 5 (docket no. 129).

of Civil Procedure 52(c). Defendants' Rule 52(c) motion is GRANTED in part and DENIED in part as indicated, and for the reasons set forth, in the following Findings of Fact and Conclusions of Law.

<u>**Findings of Fact and Conclusions of Law**</u>

**A.** <u>**Parties and Jurisdiction**</u>

1. Plaintiff Eko Brands, LLC ("Eko Brands") is a Washington limited liability company having a principal place of business in Woodinville, Washington.

2. Eko Brands is in the business of manufacturing and selling reusable beverage cartridges that are commonly used with single-serve coffee makers, such as those sold under the Keurig® brand. Eko also sells paper filters and cleaning tablets to be used in connection with the reusable beverage cartridges.

3. Eko Brands has received Certificates of Registration from the United States Patent and Trademark Office ("PTO") for the trademarks EKOBREW and the ekobrew design (collectively, the "EKOBREW Marks"). The Certificates of Registration, bearing Registration Nos. 5,073,356 and 5,073,357, respectively, were issued on November 1, 2016, and they indicate that the EKOBREW Marks were first used on September 7, 2011, in connection with reusable filters, not made of paper, for use in electric brewing machines for beverages.

4. Defendant Adrian Rivera Maynez Enterprises, Inc. ("ARM") is a Nevada corporation having a principal place of business in California.

5. Defendant Adrian Rivera is the owner, founder, and president of ARM, and resides in California.

6. Defendants are in the business of manufacturing and selling reusable beverage cartridges that are commonly used with single-serve coffee makers, such as those sold under the Keurig® brand.

7. Rivera has received Certificates of Registration from the PTO for the trademarks ECO FILL, ECO CARAFE, ECO FILTER, PERFECT POD, and EZ-CUP. Certificate of Registration No. 4,239,190 for ECO FILL was issued on November 6, 2012, and indicates that ECO FILL was first used on September 7, 2012, in connection with reusable single serving coffee filters, not made of paper, which are part of an electric coffee maker. Certificate of Registration No. 4,796,840 for ECO CARAFE was issued on August 18, 2015, and indicates that ECO CARAFE was first used on February 4, 2015, in connection with empty brewing cartridges for use in electric coffee machines. Certificate of Registration No. 5,741,858 for ECO FILTER was issued on April 30, 2019, and indicates that ECO FILTER was first used on August 31, 2017, in connection with paper coffee filters.

8. ARM began selling reusable beverage filter capsules under the mark ECO-FLOW in January 2016. ARM began selling cleaning kits for reusable beverage filter capsules under the mark ECO-PURE in 2018. On May 16, 2019, Mr. Rivera applied to the PTO for registration of the marks ECOSAVE and the  design, indicating that he and/or ARM intend to use the marks in connection with reusable filter cartridges for use in electric coffee brewing machines.

1    9.    ARM's sales of products under the marks ECO FILL, ECO CARAFE, and

2    ECO-FLOW between January 1, 2012, and July 31, 2019, totaled $17,952,815.00.

3    ARM's sales of products under the marks ECO FILTER, ECO-PURE, and ECOSAVE

4    through July 31, 2019, totaled $170,995.00.

5    10.    Eko Brands brought suit against ARM under Sections 32 and 43 of the

6    Lanham Act, 15 U.S.C. §§ 1114 & 1125, alleging trademark infringement and unfair

7    competition in connection with ARM's use of the marks ECO FILL, ECO CARAFE,

8    ECO-FLOW, ECO FILTER, ECO-PURE, and ECOSAVE.  The Court concludes that

9    federal jurisdiction exists pursuant to 28 U.S.C. § 1338.

10   **B.    Eko Brands' Claims and Burdens of Proof**

11   11.    In connection with the first claim of trademark infringement, Eko Brands

12   must prove each of the following elements by a preponderance of the evidence:

13   (i) EKOBREW is a valid, protectable trademark; (ii) Eko Brands owns EKOBREW as a

14   trademark; and (iii) on or after November 1, 2016, defendants used a mark similar to

15   EKOBREW without Eko Brands' consent in a manner that was likely to cause confusion

16   among ordinary consumers as to the source, sponsorship, affiliation, or approval of the

17   goods.  *See* 9th Cir. Model Instr. No. 15.6; Court's Instruction No. 14 (docket no. 129).

18   12.    In connection with the second claim of unfair competition, Eko Brands

19   must prove each of the following elements by a preponderance of the evidence:

20   (i) EKOBREW was a valid, protectable trademark prior to when defendants first used

21   ECO FILL; (ii) Eko Brands owns EKOBREW as a trademark; and (iii) during the period

22   prior to November 1, 2016, defendants used a mark similar to EKOBREW without

23

1    Eko Brands' consent in a manner that was likely to cause confusion among ordinary

2    consumers as to the source, sponsorship, affiliation, or approval of the goods.  *See*

3    Court's Instruction No. 15 (docket no. 129).

4    **C.    Validity and Ownership of EKOBREW Marks**

5           13.    To be valid and protectable, a trademark must be either:  (i) inherently

6    distinctive; or (ii) descriptive with an acquired secondary meaning.  *See* 9th Cir. Model

7    Instr. Nos. 15.10 & 15.11; Court's Instruction No. 14B.

8           14.    Eko Brands contends that EKOBREW is a "suggestive" trademark and

9    therefore inherently distinctive.  Defendants assert that EKOBREW is merely a

10   "descriptive" trademark that has not acquired any secondary meaning and, as a result, is

11   not valid or protectable.  The advisory jury was asked whether the EKOBREW mark is

12   "suggestive" or "descriptive," but it could not reach a unanimous verdict.  *See* Verdict

13   (docket no. 136).  The advisory jury, however, found that the EKOBREW mark had

14   acquired secondary meaning before defendants first began to use ECO FILL.  *Id.*

15          15.    In determining whether a trademark has acquired a secondary meaning, the

16   following factors may be considered:

17          (1)    Consumer Perception.  Whether people who purchase the

18          product that bears the trademark associate the trademark with plaintiff;

19          (2)    Advertisement.  To what degree and in what manner has

20          plaintiff advertised under the trademark;

21          (3)    Demonstrated Utility.  Whether plaintiff successfully used the

22          trademark to increase the sales of its product;

23

(4)     Extent of Use.  The length of time and manner in which plaintiff used the trademark;

(5)     Exclusivity.  Whether plaintiff's use of the trademark was exclusive;

(6)     Copying.  Whether defendants intentionally copied plaintiff's trademark; and

(7)     Actual Confusion.  Whether defendants' use of plaintiff's trademark has led to actual confusion among a significant number of consumers.

The presence or absence of any particular factor does not necessarily resolve whether a trademark has acquired secondary meaning.  A trademark does not need to be used for any particular length of time to acquire a secondary meaning.  _See_ 9th Cir. Model Instr. No. 15.11; Court's Instruction No. 14B.

16.     Regardless of whether the EKOBREW Marks are "suggestive" or "descriptive," they are valid and protectable because they acquired secondary meaning before defendants began using ECO FILL in September 2012.

17.     As early as June 2011, Eko Brands received purchase orders from Amazon and J.C. Wright Sales Company (on behalf of QFC) for its EKOBREW reusable coffee (or beverage) filters for Keurig® single cup brewers; product deliveries were scheduled for mid July 2011.  During the same timeframe, Eko Brands was marketing and selling its EKOBREW filters on the Internet through its website www.ekobrew.com.

18.    When EKOBREW reusable filters debuted in September 2011, they were the #1 new release in the Amazon.com grocery category.  In the spring of 2012, the EKOBREW cartridge was among the five finalists for a Housewares Design Award.  By the end of 2012, Eko Brands had sold 262,994 cases of EKOBREW filters (12 per case), generating just over $9.5 million in gross revenue.  *See* Ex. 123 at EKOTM0254453; *see also* Tr. (Sep. 18, 2019) at 355:10-356:12 (docket no. 140).

19.    As of April 2013, Eko Brands used for its EKOBREW cartridges both cylindrical and rectangular packaging, with clear portions through which the product can be viewed.  In late 2013 and early 2014, Eko Brands began extending its use of the EKOBREW Marks to other items, namely paper filters and cleaning tablets.  As of April 2014, the top distributors or retailers of the EKOBREW "flagship" product were Ahold, Amazon, Bed Bath & Beyond, KeHe Distributors, Safeway, and Walmart.  By the time Eko Brands was acquired in 2015 by Espresso Supply, Inc., approximately 10 million EKOBREW filters had been sold.  In March 2016, Eko Brands introduced an EKOBREW "carafe" reusable filter for multi-cup brewing in the Keurig® 2.0 machine.

20.    Eko Brands has several competitors in the reusable cartridge market, including Keurig's MY K-CUP, Solofill, Melitta's JAVA JIG, and CAFÉ CUP.  ARM is the only company other than Eko Brands to use the EKO or ECO prefix in a trademark associated with filters for Keurig® and similar brewing machines.

21.    As of September 2012, when defendants began using ECO FILL, the EKOBREW Marks were linked with the industry leader at the time, *i.e.*, Eko Brands.  By then, the EKOBREW reusable filters had already gained recognition from the largest

1   e-commerce company in the United States (Amazon) and the trade publication

2   (HomeWorld Business) that sponsors the annual Housewares Design Awards.  Eko

3   Brands had devoted substantial resources to advertising under the EKOBREW Marks,

4   developing a website with the same name (www.ekobrew.com), attending trade shows,

5   and participating in social media.  Before defendants started branding with ECO FILL,

6   the EKOBREW Marks had demonstrated their utility, being linked to a product that

7   almost doubled in sales from 2011 to 2012.  During this same timeframe, no competitor

8   used a similar mark.  The Court therefore ADOPTS the advisory jury's verdict that the

9   EKOBREW Marks acquired secondary meaning before defendants first began to use

10   ECO FILL.

11         22.    Although a close call, as indicated by the advisory jury's inability to reach a

12   verdict, the EKOBREW Marks are suggestive and therefore inherently distinctive.

13   Whether a trademark is "suggestive" or "descriptive" must be determined with reference

14   to the goods that the trademark identifies.  A trademark, however, need not recite in detail

15   each feature of the related goods to qualify as merely descriptive.  To be descriptive, a

16   trademark only has to describe some aspect of the product.  Two tests apply when

17   determining whether a trademark is "suggestive" or "descriptive," namely (i) the

18   "imagination" test; and (ii) the "needs" test.  The "imagination" test asks whether a

19   mental leap is required to reach a conclusion concerning the nature of the product being

20   referenced by the trademark.  The question is not what information *could* be derived from

21   the trademark, but rather whether a mental leap is *required* to understand the trademark's

22   relationship to the product.  If a mental leap is required, then the trademark is suggestive.

23

If a mental leap is not required, then the trademark is descriptive. The "needs" test

focuses on the extent to which a trademark (or one of its components) is needed by

competitors to identify their goods. If competitors have a great need to use the

trademark, then the trademark is more likely to be descriptive. On the other hand, if the

relationship between the trademark and the product is so remote and subtle that the

trademark is not really needed by competitors to describe their goods, then the trademark

is more likely to be suggestive. _See_ 9th Cir. Model Instr. Nos. 15.10 & 15.11; Court's

Instruction No. 14B; _see also_ _Zobmondo Entm't, LLC v. Falls Media, LLC_, 602 F.3d

1108, 1117 (9th Cir. 2010).

23. The EKOBREW Marks were determined to be inherently distinctive by the

PTO; such finding was a prerequisite to the issuance of Certificates of Registration for

the EKOBREW Marks.[5]

24. When asked about ARM's competing ECO FILL trademark, Rivera

testified that he believed the mark was distinctive and entitled to protection, and he

agreed that, likewise, EKOBREW "should be protected on its own." Tr. (Sep. 17, 2019)

at 223:22 (docket no. 139). Rivera's view is that EKOBREW and ECO FILL are both

protectable trademarks, but they are not similar and can co-exist. _See id._ at 223:22–

224:3.

---

[5] Although Eko Brands was originally unsuccessful in securing registration of the EKOBREW Marks, the reason cited by the PTO was not lack of distinctiveness, but rather similarity to an already registered mark, namely ECO BREW, which is owned by Thomas Hammer Coffee Roasting, Inc. of Spokane, Washington, and used in connection with coffee beans. Eko Brands and Thomas Hammer Coffee Roasting, Inc. subsequently entered into a trademark coexistence agreement.

25.     Both the PTO's decision to permit registration of the EKOBREW Marks and Rivera's concession on the subject support a finding that the EKOBREW Marks are valid.  Moreover, both the "imagination" test and the "needs" test lead to the conclusion that the EKOBREW Marks are "suggestive," rather than merely "descriptive."  Although the term ECO, or its phonetic equivalent EKO,[6] in combination with BREW, connotes an ecological or environmentally-friendly brewing solution, it does not itself describe the approach embodied in the EKOBREW products.  Rather, a "mental leap" is required to understand that the device referenced by the EKOBREW Marks is a reusable filter or cartridge for a single-serving beverage brewing machine.  This conclusion is reinforced by the absence of competitors other than ARM that use ECO or EKO, or BREW, as part of their brand names.  The lack of "need" demonstrated by this evidence tends to show that EKOBREW is "suggestive," rather than "descriptive."  The Court's finding that EKOBREW is "suggestive" and therefore inherently distinctive constitutes an alternative basis for concluding that the EKOBREW Marks are valid and protectable.

---

[6] Eko Brands contends that EKO is a fanciful or coined word entitled to be treated as "arbitrary" for the purpose of determining its inherent distinctiveness.  Such argument runs contrary to the weight of authorities.  *See* *Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315, 328 (1938) (observing that "the mark 'Nu-Enamel' is descriptive of a type of paint long familiar to manufacturers, with the addition of the adjective new, phonetically spelled or misspelled"); *Unisplay S.A. v. Am. Elec. Sign Co.*, 28 U.S.P.Q.2d 1721 (E.D. Wash. 1993) (concluding that "Solar Glo," which incorporated an incomplete form of "glow," was descriptive and had no secondary meaning); *In re Calphalon Corp.*, 122 U.S.P.Q.2d 1153 (T.T.A.B. 2017) (affirming the refusal to register SHARPIN, as being equivalent to "sharpen," which was merely descriptive in connection with cutlery blocks containing built-in blade sharpeners).

26.     Regardless of whether the EKOBREW Marks are "suggestive" or "descriptive," Eko Brands owned the EKOBREW Marks before defendants first began to use ECO FILL.  If the EKOBREW Marks are "suggestive," then Eko Brands has the burden of showing by a preponderance of the evidence that it used the EKOBREW Marks for its products before defendants began to use ECO FILL to market their products in the area where Eko Brands sells its product.  On the other hand, if the EKOBREW Marks are "descriptive," then Eko Brands has the burden of showing by a preponderance of the evidence that the EKOBREW Marks gained secondary meaning before defendants first began to use ECO FILL.  *See* 9th Cir. Model Instr. No. 15.13; Court's Instruction No. 14C.  For the same reasons outlined with respect to the validity of the EKOBREW Marks, the Court ADOPTS the advisory jury's verdict that Eko Brands has made the requisite showing of ownership of the EKOBREW Marks.

**D.     Likelihood of Confusion**

27.     Defendants' use of their "ECO" trademarks is likely to cause confusion about the source of Eko Brands' and/or ARM's goods.  In connection with its first claim of trademark infringement occurring on or after November 1, 2016, Eko Brands challenges the following ARM trademarks:  ECO FILL, ECO CARAFE, ECO-FLOW, ECO FILTER, ECOSAVE, and ECO-PURE.  With respect to its second claim of unfair competition occurring before November 1, 2016, Eko Brands contends that the following ARM trademarks were infringing:  ECO FILL, ECO CARAFE, and ECO-FLOW.

28.     ARM first generated revenue in November 2012 from use of the ECO FILL mark.  ARM began deriving income in connection with the ECO CARAFE mark in 2015,

the ECO-FLOW mark in 2017, and the ECO FILTER, ECOSAVE, and ECO-PURE marks in 2019.  *See* Exs. 274 & 473.

29.     Like Eko Brands, ARM maintains a website (www.perfectpod.com) through which it markets and sells its products.  ARM also has a presence on Amazon and on social media, and has participated in the same trade shows (within the same exhibition space) as Eko Brands.  ARM distributes its products through "big-box" retailers like Target and Bed Bath & Beyond, as well as through "regional chains" like Meijer, but not within grocery stores, like Safeway, which is among Eko Brands' top customers for EKOBREW products.  Tr. (Sep. 18, 2019) at 423:22-424:5 (docket no. 140); Exs. 149 & 167.  ARM had a relationship with Walmart until late 2012 or early 2013, when Eko Brands secured a contract with the retailer and ARM lost the account.  *Id.* at 425:10-20.  Eko Brands' EKOBREW filters and ARM's ECO FILL capsules are priced within the same range ($5 to $12), and they are considered "impulse" buys as to which purchasers perform little to no advance research.

30.     In comparing the accused trademarks with the EKOBREW Marks to determine whether a likelihood of confusion exists, the Court has considered, as it must, each mark as a whole, and not merely a component of the marks, and the Court has applied the non-exhaustive *Sleekcraft* factors, which are as follows:  (1) strength or weakness of the marks; (2) proximity of the goods; (3) similarity of the marks; (4) actual confusion; (5) marketing channels used; (6) consumer's degree of care; (7) defendants' intent; and (8) likelihood of product line expansion.  The Court has been mindful that the presence or absence of any particular factor does not necessarily resolve the question of

whether confusion is likely.  *See* 9th Cir. Model Instr. No. 15.18; Court's Instruction No. 14D; *see also* *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).

31.    Although the marks at issue are fairly weak,[7] a finding of infringement is nevertheless supported by the proximity of the goods with which they are associated (*i.e.*, direct competitors), the similarity of the marks (containing an aurally-identical prefix), and the overlap in marketing channels within which the products are advertised and travel (namely, e-commerce and certain brick-and-mortar retailers).  *See* *Sleekcraft*, 599 F.2d at 350 (observing that "[a]lthough appellant's mark is protectible and may have been strengthened by advertising, it is a weak mark entitled to a restricted range of protection" and "only if the marks are quite similar, and the goods closely related, will infringement be found" (citations omitted)).  In addition, the inexpensive nature of the products and the resultant lack of caution exercised by consumers, as well as both Eko Brands' and ARM's efforts to expand the use of their respective marks to complementary products, like paper filters and cleaning materials, weigh in favor of finding some likelihood of confusion.[8]  Finally, defendants' intent to exploit Eko Brands' success by adopting a

---

[7] A strong mark is one that is arbitrary or fanciful, while a descriptive mark is much weaker and will not enjoy protection absent proof of secondary meaning; a suggestive mark falls somewhere in the middle.  *See* *Sleekcraft*, 599 F.2d at 349.  On the continuum of types of trademarks, both EKOBREW and ECO FILL are close to the boundary of descriptiveness, and neither mark is entitled to the "wide ambit" of protection afforded to arbitrary or fanciful marks.  *See id.*

[8] At trial, Eko Brands presented no evidence of any surveys or litigation studies done to assess whether confusion is likely or actually exists.  Eko Brands offered only anecdotal evidence of a few instances of confusion, one involving an individual, Rabbi Zev Schwartz, who bought a machine manufactured by one of Keurig's competitors (OXX) and inquired of an Eko Brands' customer service agent whether ARM's ECO FILL cartridge would work in his device, another in which representatives from Bonavita (which makes automatic coffee brewers) and a Chinese

visually and aurally similar mark, as will be discussed in further detail in the subsequent

section, further persuades the Court that the advisory jury reached the correct result, and

its verdict that a likelihood of confusion exists between the EKOBREW Marks and each

of ARM's marks, namely ECO FILL, ECO CARAFE, ECO-FLOW, ECO FILTER,

ECOSAVE, and ECO-PURE, is ADOPTED.

**E.    Willfulness**

32.    To be entitled to the disgorgement of defendants' profits, Eko Brands must

prove by a preponderance of the evidence that defendants' infringement was willful.

Court's Instruction No. 18; *see* 15 U.S.C. § 1117(a); *see also Stone Creek, Inc. v. Omnia*

*Italian Design, Inc.*, 875 F.3d 426, 439-42 (9th Cir. 2017).  Conduct is "willful" if it is

calculated to exploit the advantage of an established trademark or it is done deliberately

with an intent to deceive.  Court's Instruction No. 16; *see Lindy Pen Co. v. Bic Pen*

*Corp.*, 982 F.2d 1400, 1405-06 (9th Cir. 1993), *abrogated in part on other grounds by*

*SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016).

33.    Before adopting the ECO FILL mark in 2012, defendants used the marks

PERFECT POD and EZ-CUP.  The PERFECT POD EZ-CUP consists of a small plastic

cup or cartridge that would hold a paper filter into which coffee grounds could be placed

---

glass factory mistook ARM's ECO FILL capsule as an EKOBREW product and brought it to a
meeting with Laura Sommers, one of the owners of Eko Brands, and unspecified times when
unidentified friends of Christopher Legler, another owner of Eko Brands, told him they had
purchased an EKOBREW filter from a retailer that does not sell the product.  Given the volume
of sales at issue, these isolated events do not establish the type of "actual confusion" referenced
in the *Sleekcraft* factors.

for brewing. In 2011, defendants began developing a plastic capsule with an integrated metal filter or screen. In connection with this new product, defendants considered the names GREEN CUP and EZ-FILL, which was a natural extension of the existing mark EZ-CUP. In November 2011, a designer was commissioned to provide branding and packaging concepts for EZ-FILL. On December 3, 2011, the designer proposed three different EZ-FILL logos, each to be incorporated on rectangular packages with clear portions through which the product could be viewed. The options were as follows:

 

Ex. 100.

     34.    On December 8, 2011, for reasons not explained at trial, the designer offered three logo ideas for ECO FILL, each in three color treatments, as follows:

  

  

  

Ex. 169.

35.     Rivera chose the middle design in the left column, which features yellow-colored lines, representing steam, wafting from a brown coffee cup centered in the "O" of ECO, the letters of which are green, contrasted with FILL in yellow letters, against a brown background with an orange border.  During this same timeframe, Eko Brands used a logo for EKOBREW that highlighted the "k" in green, distinguished BREW with almost the same hue of yellow that defendants adopted for FILL, and included a coffee cup with lines emanating upward (suggestive of steam, but forming the shape of a plant), all against a dark brown background.

    

ARM's ECO FILL Package          Eko Brands' EKOBREW Package
Ex. 29                          Exs. 91 & 95 (from www.ekobrew.com
                                in September 2011 and January 2012).

36.     On December 19, 2011, Rivera applied to the PTO to register ECO FILL, indicating anticipated first use of the mark in September 2012.  In contrast, Rivera did not seek registration of PERFECT POD until February 2016, even though the mark is part of

1  defendants' website address and had been used in connection with the EZ-CUP product

2  since at least 2010 and with respect to paper filters since 2006.

3       37.     Dino Ditta, the Vice President of ARM, testified that the name ECO FILL

4  was associated with the new reusable filter from "day one" of its development, which

5  was sometime in April 2011.  Tr. (Sep. 18, 2019) at 418:20-419:1 (docket no. 140).  This

6  statement is inconsistent with the decision to pay a designer $5,800 to work exclusively

7  on a logo and packaging for an entirely different mark, *i.e.*, EZ-FILL.  <u>See</u> Ex. 98.  The

8  Court finds that defendants did not contemplate using the mark ECO FILL until early

9  December 2011, after receiving the designer's initial concepts for EZ-FILL.

10      38.     Rivera testified that he did not know about Eko Brands or EKOBREW in

11 2011, before he sought to federally register the ECO FILL mark.  Tr. (Sep. 17, 2019) at

12 184:11-185:15 (docket no. 139).  Having observed Rivera's demeanor during trial and

13 considered the other evidence in the record, the Court finds that Rivera's denial of

14 knowledge is not credible.  The evidence establishes that, before EKOBREW's launch in

15 September 2011, defendants intended to simply extend their "EZ" line by calling their

16 new product EZ-FILL.  In December 2011, after committing resources to develop a logo

17 and packaging for the EZ-FILL mark, defendants abruptly changed course and adopted

18 the ECO FILL mark.  Given the absence of any explanation for this behavior,[9] the Court

19 _____

20 [9] Ditta testified that the designer defendants had employed, Al Nanakonpanom ("Nana"), died in
   2015.  Although Nana was not available as a witness, any direction he had been given to perform
21 extra work at "no additional cost" on "some 'spectacular' logo concepts," Ex. 168, could have
   been discussed at trial by Rivera and/or Ditta, and the Court concludes that defendants were not
22 prejudiced by Nana's absence.

23

finds that it was calculated to exploit the success EKOBREW had experienced in the preceding months.

39. In response to questioning by Eko Brands' counsel, Rivera acknowledged at trial that he keeps his eyes on the competition by monitoring Amazon and other marketplaces, but he speculated that he did not become aware of EKOBREW until late 2012 or "maybe 2013." Tr. (Sep. 17, 2019) at 181:5-184:4, 184:20-21 (docket no. 139). EKOBREW's status as a #1 new release on Amazon in September 2011 could not have escaped Rivera's and/or Ditta's notice for long, and certainly not for a year or more, as Rivera suggests. Moreover, Rivera's estimate of learning about EKOBREW in late 2012 or 2013 is contradicted by Ditta's testimony that, in January 2012, a manufacturer with whom he was working on a different product told him about EKOBREW. Tr. (Sep. 18, 2019) at 419:12-420:10 (docket no. 140). Even if they were not aware of EKOBREW before seeking registration of ECO FILL, defendants knew about the competing mark several months before they introduced their similarly-named product into the market.

40. The haste with which Rivera applied to register ECO FILL also undermines his assertion that he was unaware of EKOBREW at the time. Defendants could have ascertained from the PTO's records that Eko Brands had been unsuccessful in its initial attempt to register EKOBREW, and the relative speed with which an application for ECO FILL was filed (less than two weeks after the ECO FILL logo was developed versus 6-to-10 years after using PERFECT POD in commerce) constitutes evidence of defendants' desire to beat Eko Brands to the proverbial punch. These facts demonstrate

circumstantially that defendants knew about EKOBREW when they adopted ECO FILL

as the brand name for their new product.

41.     The progression in logo development further belies Rivera's denials.

Although each of the three package concepts for EZ-FILL contained an image of a coffee

cup, none of the proposed logos for EZ-FILL incorporated a coffee cup or steam lines.

The first two concepts for EZ-FILL had no illustrative component, and the third idea

included a donut shape over a tapered cylinder, suggestive of the side view of an open

filter cartridge.  In contrast, two of the designs for ECO FILL had coffee cups with steam

lines, and the third proposal had steam lines.  This significant shift in style suggests that

the designer was influenced by the EKOBREW logo.  Moreover, the color choices for the

ECO FILL logo, which mimic both the palette and the contrasts of the EKOBREW logo,

tend to prove defendants copied, and therefore had knowledge of, Eko Brands' labeling.

42.     The Court ADOPTS the advisory jury's verdict that, for purposes of both

the first claim of trademark infringement and the second claim of unfair competition,

defendants' infringement was willful,[10] and concludes that Eko Brands is therefore

entitled to disgorgement of the profits attributable to such infringement.

---

[10] In light of the Court's finding of willfulness, the Court need not address defendants' argument
that Eko Brands' claims are barred by the equitable doctrine of laches.  *See* *Danjaq LLC v. Sony
Corp.*, 263 F.3d 942, 956 (9th Cir. 2001) (observing, in the copyright context, that "laches does
not bar a suit against a deliberate infringer"); *see also* *Nat'l Lead Co. v. Wolfe*, 223 F.2d 195, 202
(9th Cir. 1955) ("In the light of the intentional and fraudulent use of appellant's trade mark, the
[laches] defense here is a frivolous one." (citing *Menendez v. Holt*, 128 U.S. 514, 523 (1888)));
*Fitbug Ltd. v. Fitbit, Inc.*, 78 F. Supp. 3d 1180, 1195-96 (N.D. Cal. 2015) (declining to apply the
"piracy" exception to laches because the infringement at issue was not willful).

**F.  Disgorgement of Profits**

43.  With respect to the first claim for trademark infringement, Eko Brands may recover any profits earned by defendants on or after November 1, 2016, that are attributable to the infringement.  With respect to the second claim for unfair competition, Eko Brands may recover any profits of defendants that are attributable to the unfair competition, subject to the following limitations:  (i) Eko Brands may not recover any such profits earned before defendants had actual notice that Eko Brands was using the EKOBREW Marks; and (ii) Eko Brands may not recover any such profits earned on or after November 1, 2016.  Court's Instruction No. 18; *see* *Coach, Inc. v. Asia Pac. Trading Co.*, 676 F. Supp. 2d 914, 924-25 (C.D. Cal. 2009).

44.  Profit is determined by deducting all expenses from gross revenue.  Gross revenue is all of defendants' receipts from sales of products bearing infringing marks.  Expenses are all operating, overhead, and production costs incurred in producing the gross revenue.  Eko Brands has the burden of proving defendants' gross revenue by a preponderance of the evidence.  Defendants have the burden of proving their expenses, as well as the portion of their profit attributable to factors other than the use of infringing marks, by a preponderance of the evidence.  9th Cir. Model Instr. No. 15.29; *see* 15 U.S.C. § 1117(a).

45.  Eko Brands seeks the following amounts as "profit" earned by defendants:

| | | | |
|---|---|---|---|
| Claim 1 | November 1, 2016 - July 31, 2019 | $ | 439,075.50 |
| | August 1, 2019 - present | $ | 57,092.00 |
| | | | per month |
| Claim 2 | January 1, 2012 - October 31, 2016 | $ | 5,618,371.50 |

Defendants offer five reasons why Eko Brands is not entitled to the requested sums,

namely (i) Eko Brands already recovered a portion of these figures in connection with

previous patent litigation between the parties; (ii) a portion of the profit is not attributable

to trademark infringement or unfair competition but rather to the ECO FILL product's

compatibility with the new Keurig® 2.0 machine; (iii) the amount sought for the period

from August 1, 2019, to the present is unsupported by any evidence; (iv) the sums

proposed by Eko Brands fail to take into account expenses proven by defendants; and

(v) the decline in EKOBREW sales, which began in 2013, was not caused by defendants'

use of similar marks but rather by Eko Brands' introduction of a cheaper version of its

reusable filter product under a different brand, namely BREW & SAVE.

### a.  Prior Patent Litigation

46.  In *Eko Brands, LLC v. Adrian Rivera Maynez Enterprises, Inc., et al.*,

W.D. Wash. Case No. C15-522 JPD, a jury awarded damages to Eko Brands and against

ARM and Rivera in the amount of $192,801.00 for non-willful infringement of United

States Patent No. 8,707,855 (the "'855 Patent").  *See* Verdict (C15-522, docket no. 242).

The products alleged to infringe the '855 Patent were ARM's reusable filters branded as

ECO-FILL DELUXE (also known as ECO FILL 1.0 - 2 pack), ECO-FILL DELUXE 2.0

(also known as ECO FILL 2.0), ECO-FLOW v1, and ECO-FLOW v2.  *See* Pretrial Order

at ¶ II.1 (C15-522, docket no. 218).  The jury was instructed that the commencement date

for damages was April 2, 2015.  Instr. No. 39 (C15-522, docket no. 233).  The amount

of damages reflected the reasonable royalty that the jury found would compensate Eko

1  Brands for the patent infringement at issue, through the date of the verdict, which was

2  June 8, 2018.  *See* Instr. Nos. 36-38 (C15-522, docket no. 233).

3       47.  During his opening statement in the patent trial, counsel for Eko Brands

4  told the jury that the claim for infringement of the '855 Patent "covers the entirety of this

5  unit," meaning ARM's ECO FILL and/or ECO-FLOW capsule, and that Eko Brands is

6  "entitled to the royalty based on that unit."  Tr. (June 4, 2018) at 65:19-22 (C15-522,

7  docket no. 326).  According to Eko Brands' attorney, the features of ARM's product

8  could not be apportioned so as to reduce the royalty rate, and the unit was "not divisible

9  in any other way."  *Id.* at 65:15-23.  In his opening statement in the trademark matter, the

10  same lawyer for Eko Brands explained disgorgement as follows:  "Remember that graph,

11  the inverse relationship as Eko's profits went down . . . , defendants' went up.  And it's

12  that delta there, or the disgorgement of profits that trademark law allows [Eko Brands] to

13  recover."  Tr. (Sep. 16, 2019) at 21:22-22:1 (docket no. 138).[11]

14       48.  To the extent Eko Brands alleges that defendants' profit in connection with

15  the ECO FILL and ECO-FLOW products was attributable exclusively to trademark

16  infringement, such theory runs contrary to the premise on which the jury in the patent

17  case awarded damages, *i.e.*, that defendants profited from infringing the '855 Patent

18  without paying a reasonable royalty.  The patent royalty owed by defendants, which

19  constitutes an item of expense to be deducted from gross revenue to compute net profit,

20  _____

21  [11] To the extent Eko Brands contends that it is entitled to both its losses (decline in profit), as
well as defendants' profit, such assertion is inconsistent with Eko Brands' withdrawal of its

22  claim for actual damages.  *See* Pla.'s Resp. (docket no. 120).

23

cannot now be ignored without resulting in double recovery. Moreover, Eko Brands will not be permitted in equity to argue that, for purposes of disgorgement under the Lanham Act, branding is all that matters when, in the patent context, it took the position that the various product features, including the labeling, were not divisible. The Court therefore concludes that Eko Brands is not entitled, in connection with either claim in this action, to disgorgement of defendants' profit associated with products bearing the marks ECO FILL DELUXE, ECO FILL DELUXE 2.0, or ECO-FLOW during the period from April 2, 2015, through June 8, 2018, for which Eko Brands was awarded damages in the patent litigation.[12]

### b. **Compatibility With Keurig® 2.0**

49.     In early 2014, defendants became aware that Keurig was planning to introduce a new brewing machine with a security feature that would inhibit the use of non-Keurig cartridges unless they were officially licensed. Prior to the launch of the Keurig® 2.0 machine, ARM's Vice President Dino Ditta was able to obtain a sample and, upon investigation, determined that the security feature was ink or color based. Thus, when Keurig® 2.0 was placed on the market in October 2014, ARM was ready with a compatible product. Prior to the introduction of the Keurig® 2.0 machine, ARM had a

---

[12] Both sides have appealed from the judgment in the patent litigation, and the matter remains pending before the United States Court of Appeals for the Federal Circuit. Any reversal or modification of such judgment by the Federal Circuit would have minimal effect on the award of profit in this matter for two reasons: (i) ARM sustained net losses during most of the period for which Eko Brands was awarded patent royalties; and (ii) a separate basis exists for excluding the profit related to ECO-FILL DELUXE 2.0 (ECO-FILL 2.0), as explained in the next subsection.

relatively low volume of sales of ECO FILL capsules. After Keurig® 2.0 arrived on the market, ARM's ECO FILL related revenues soared.

50.     In early 2015, Eko Brands offered its initial solution for the Keurig® 2.0 security issue, namely a sheet of fluorescent orange stickers that could be placed on the existing EKOBREW cartridges, but this approach was not popular with consumers. Eko Brands subsequently adopted a purple dye cast method of defeating Keurig's security device, as a result of which the EKOBREW product, which had previously been brown in color, began looking more like ARM's ECO FILL 2.0 capsules, which are pinkish-purple in hue.

51.     As reflected in Chart 1, ARM's gross revenue for ECO FILL branded products drastically increased shortly after Keurig® 2.0 machines began selling, when the ECO FILL filter was one of very few options for Keurig's new device, but as Eko Brands and other competitors also started offering Keurig® 2.0 compatible cartridges, ARM's market share substantially declined.



Source of Data for Chart 1: Ex. 473.

52. The correlation between ARM's ECO FILL related gross revenues and its status as the first, and, for a brief period, only, manufacturer (other than Keurig) with an operable reusable filter for Keurig® 2.0 machines is convincing circumstantial evidence that defendants' profit associated with the ECO FILL 2.0 product is attributable to a factor other than trademark infringement and/or unfair competition.[13]  The Court therefore DECLINES to adopt the advisory jury's calculation of profit to be disgorged.

### c.   **Insufficiency of Evidence**

53. With regard to defendants' profit for the period from August 1, 2019, to the present, Eko Brands did not satisfy its burden of proving gross revenue.  The amount sought for the approximately six-week period before trial and thereafter (*i.e.*, $57,092.00 per month) is entirely speculative, extrapolated from variable monthly profit figures for the preceding years without any expert (or even lay) testimony to support such analysis. Eko Brands is not entitled to disgorgement of defendants' profit on or after August 1, 2019.

---

[13] Defendants offered a similar explanation concerning ARM's ECO CARAFE filter, indicating that Eko Brands' similar carafe-sized product also had compatibility issues with the Keurig® 2.0 machine, but in contrast to the testimony concerning the ECO FILL 2.0 device, defendants did not provide evidence concerning the timing of the changes Keurig made to the security system, which necessitated a redesign of the carafe cartridge, or the monthly sales before and after ARM rolled out its solution.  As a result, the Court cannot draw the same conclusion with respect to ECO CARAFE as it has in connection with ECO FILL 2.0, and instead concludes that defendants have not met their burden of proving that any portion of the profit derived from use of the mark ECO CARAFE is attributable to the ARM product's superior compatibility with Keurig's 2.0 device.

### d. **Expenses**

54.     In attempting to meet their burden of proving expenses, defendants relied on financial summaries provided in a spreadsheet format.  _See_ Exs. 89 & 274.  The spreadsheets itemized expenses on a yearly basis, and they divided the annual overhead between the "ECO" part and the remainder of ARM's business.  Defendants have proffered sufficient evidence to support the expenses that must be deducted from gross revenue in calculating the profit to be disgorged.

55.     Given the need to apportion the profit between Eko Brands' two claims, which involve different sets of infringing marks and distinct time frames, the Court has used the data set forth in Exhibit 274, which is duplicated in Exhibit 89, to allocate "ECO" related expenses pro rata among the various marks.  The pro rata computation was performed on the basis of gross profit (gross revenue minus cost of goods).  For example, in 2014, the gross profit generated by ECO FILL 1.0 ($148,777 + $280,446) and ECO FILL MAX ($10,317) capsules was $439,540.  This figure represents roughly 52% of the gross profit for all "ECO" products ($841,628), and thus, 52% of the "ECO" related expenses (or $233,634 of the total $447,360) was deducted to arrive at a net profit figure of $205,906 for ECO FILL 1.0 and ECO FILL MAX products combined (referred to in Tables 1 and 2, _infra_ ¶¶ 59 & 60, as simply "ECO FILL 1.0").  This analysis was performed for each brand and year at issue.

### e. **Cannibalization**

56.     In 2012 or 2013, Eko Brands began offering a reusable filter under the mark BREW & SAVE.  The BREW & SAVE cartridge is lower in price than the

comparable EKOBREW capsule, and the two products are or were sold in different aisles of the same stores.  By 2014, the revenue generated by Eko Brands' BREW & SAVE devices rivaled that of its EKOBREW filters.  In 2015, BREW & SAVE sales declined, while those of EKOBREW began to rebound.  The combined revenue on EKOBREW and BREW & SAVE goods remained roughly constant from 2013 through 2015, hovering in the range of $5 million annually.



Source of Data for Chart 2: Ex. 123.[14]

57.    Although counsel for Eko Brands asserted in closing argument that this "cannibalization" does not explain the drop in EKOBREW's revenue, Eko Brands' own

---

[14] In 2012, Eko Brands began marketing its filters to other companies like Rockline Industries, which has since offered the capsules manufactured by Eko Brands under the "Brew Rite" label, SuperValu, Inc., which offers various goods under the Essential Everyday® trademark, and the country's largest supermarket chain, the Kroger Company, which has several in-store brands. _See_ Ex. 149 at 19; _see also_ www.supervalu.com; www.kroger.com.  The revenue generated by this "private label" business is excluded from the figures reflected in Chart 2.

evidence undermines his position.  According to an April 2014 management presentation, admitted as Exhibit 149, Eko Brands did not experience much growth in revenue between 2012 and 2013, but the shares attributable to Eko Brands' "private label" (_e.g._, Kroger, "Brew Rite," Essential Everyday®) business and BREW & SAVE products increased significantly, from 5.5% to 14.9% and from 3.1% to 9.8%, respectively.  At the same time, the percentage of sales generated by EKOBREW goods dropped from 91.4% to 71.5%.  This data shows that, at least during the period when defendants first began using the ECO FILL mark, the first in their line of similar marks, cannibalization (in contrast to defendants' unfair competition) was a significant factor in EKOBREW's declining sales.[15]



Source of Data for Chart 3: Ex. 149.

---

[15] This evidence also suggests that, if Eko Brands had not withdrawn its request for actual damages, it would not have been able to prove at trial any losses caused by defendants' unfair competition and/or trademark infringement.

1    58.    Defendants, however, have not carried their burden of proving the extent to

2  which cannibalization constitutes a reason other than trademark infringement and/or

3  unfair competition for ARM's accrual of profit in connection with its ECO FILL, ECO

4  CARAFE, ECO-FLOW, and related products.  Absent a quantified correlation between

5  defendants' profit and Eko Brands' approach of competing with itself, the Court cannot

6  base any diminution of the amount to be disgorged on such cannibalization, but it will

7  consider the subject in connection with the injunctive relief that Eko Brands seeks.

8          f.    **Calculation of Award**

9    59.    For the foregoing reasons, the Court reaches a different result than the

10  advisory jury concerning the amount of profit to be disgorged by defendants.  With

11  respect to Eko Brands' first claim for trademark infringement, the Court's analysis is as

12  follows:

**Table 1: CLAIM 1 (Trademark Infringement)**
**Defendants' Profits to Be Disgorged**

| Mark | Period Allowed | Profit Awarded |
|---|---|---|
| ECO FILL 1.0 | November 1, 2016 - July 31, 2019 | $  41,163 |
| ECO FILL DLX 1.0 | June 9, 2018 - July 31, 2019 | $        0 [16] |
| ECO CARAFE | November 1, 2016 - July 31, 2019 | $    2,765 |
| ECO-FLOW | June 9, 2018 - July 31, 2019 | $  76,485 |
| ECO FILTER | November 1, 2016 - July 31, 2019 | $    6,740 |
| ECOSAVE | November 1, 2016 - July 31, 2019 | $      683 |
| ECO-PURE | November 1, 2016 - July 31, 2019 | $    6,204 |
|  | TOTAL | $ 134,040 |

---

[16] No product bearing the mark ECO FILL DELUXE (or ECO FILL DELUXE 1.0, as opposed to ECO FILL DELUXE 2.0) was sold during the period specified.  *See* Ex. 274.

60.     As for Eko Brands' second claim alleging unfair competition, further discussion is warranted concerning the profit associated with defendants' use of the mark ECO CARAFE.  Although Eko Brands' co-owner Laura Sommers approximated that, in 2015, Eko Brands began selling carafe-size filters under the EKOBREW Marks, she admitted during cross-examination that she did not know which company, ARM or Eko Brands, was the first to launch a carafe product.  *See* Tr. (Sep. 16, 2019) at 66:13-15 (docket no. 138);  Tr. (Sep. 17, 2019) at 163:11-16 (docket no. 139).  Other evidence, including facts stipulated by the parties, indicates that ARM entered the carafe market in early February 2015, while Eko Brands trailed far behind and did not introduce a carafe device until March 2016.  During the interim, defendants generated a profit of $822,290 on sales of ECO CARAFE filters.[17]  For three consecutive years beginning in 2016, when Eko Brands began offering a carafe filter carrying the EKOBREW Marks, defendants experienced net losses.  The Court finds that the profit associated with use of the mark ECO CARAFE during the time frame of Claim 2 is attributable to a factor other than unfair competition, namely the absence of any competing EKOBREW carafe-size product.  In light of this and other rulings, the Court concludes that the amount of profit to be disgorged by defendants, in connection with Eko Brands' second claim for unfair competition, is as follows:

---

[17] In 2015, the gross profit associated with ECO CARAFE was $1,536,966. Ex. 274.  This amount represented about 27.2% of the gross profit in 2015 for "ECO" products in the aggregate ($5,657,602).  Subtracting a pro rata share of the expenses for 2015 ($714,676 = $2,630,738 x (1,536,966 ÷ 5,657,602)) yields a net profit of $822,290 for ECO CARAFE devices in 2015.

**Table 2: CLAIM 2 (Unfair Competition)**
**Defendants' Profits to Be Disgorged**

| Mark | Period Allowed | Profit Awarded |
|------|----------------|----------------|
| ECO FILL 1.0 | January 1, 2012 - October 31, 2016 | $ 514,326 |
| ECO FILL DLX 1.0 | January 1, 2012 - April 1, 2015 | $     822 |
| ECO CARAFE | January 1, 2012 - October 31, 2016 | $      0 |
| ECO-FLOW | January 1, 2012 - April 1, 2015 | $      0 [18] |
| | TOTAL | $ 515,148 |

## G.    Injunctive Relief

61.    Eko Brands seeks a permanent injunction prohibiting defendants from

using the marks ECO FILL (including ECO FILL DELUXE, ECO FILL DELUXE 2.0,

and ECO FILL MAX), ECO CARAFE, ECO-FLOW, ECO-PURE, ECO FILTER, and

ECOSAVE or any similar marks, and requiring defendants to deliver for destruction all

advertising materials, products, labels and packaging, and business materials bearing

such marks.  The Lanham Act invests the Court with the "power to grant injunctions,

according to the principles of equity and upon such terms as the court may deem

reasonable, to prevent the violation of any right" of the owner of a registered trademark.

15 U.S.C. § 1116(a).  To be entitled to such relief, Eko Brands must prove (i) it has

suffered an irreparable injury; (ii) remedies available at law, like monetary damages, are

not adequate to compensate for such injury; (iii) the balance of hardships weighs in favor

of granting the requested remedy in equity; and (iv) the public interest would not be

[18] Defendants did not begin using ECO-FLOW until January 2016, which was after Eko Brands initiated the patent litigation involving ECO-FLOW (and ECO FILL) products.  Thus, for the period indicated, no profit related to ECO-FLOW was generated or is required be disgorged.

disserved by the imposition of a permanent injunction.  *See Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1137-38 & n.11 (9th Cir. 2006).

62.     To establish irreparable injury, Eko Brands must "do more than merely demonstrate that a trademark has been infringed or that consumers have been confused." *See San Miguel Pure Foods Co. v. Ramar Int'l Corp.*, 625 Fed. App'x 322, 327 (9th Cir. 2015); *see also Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) ("Gone are the days when '[o]nce the plaintiff in an infringement action has established a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief does not issue.'" (alteration in original)). Irreparable injury might consist of the loss of control over business reputation and/or damage to goodwill, but such harm must be grounded in evidence, not "platitudes," and it may not be presumed from infringement alone or based on speculation.  *See Herb Reed*, 736 F.3d at 1250; *see also San Miguel*, 625 Fed. App'x at 327-28 (vacating a permanent injunction, reasoning that the district court's finding of irreparable harm was premised on speculation that the trademark owner "*would* effectively lose control" over its brand, "not that it actually had" (emphasis in original)).

63.     Eko Brands has not made the requisite showing of irreparable injury to warrant the type of broad injunctive relief it has requested.  In asserting that defendants' infringement has taken Eko Brands' "reputation out of its own hands" and "eroded" Eko Brands' goodwill, Eko Brands relies merely on the "erosion" of EKOBREW sales.  Pla.'s Proposed Findings & Conclusions at 25, ¶ 101 (docket no. 144).  The decline in revenue generated by EKOBREW products is, however, explained by the concomitant success of

Eko Brands' "private label" and BREW & SAVE businesses. Eko Brands has not refuted that EKOBREW's reduction in earnings is primarily the result of cannibalization, rather than infringement, and it has not presented any evidence concerning the historical or current market shares of EKOBREW and ARM products, respectively.[19] Instead, Eko Brands relies on the types of platitudes, presumptions, and speculations that the United States Court of Appeals for the Ninth Circuit has routinely rejected in considering the appropriateness of injunctive relief.

64. In 2016, 2017, and 2018, the "ECO" part of ARM's business suffered net losses, while Eko Brands' EKOBREW products generated revenue in those same years of

[19] At trial, counsel for Eko Brands offered Exhibit 80, which sets forth Eko Brands' and its competitors' market shares for the year ending February 25, 2017, but defendants' hearsay objection was sustained, and Exhibit 80 was not admitted. _See_ Tr. (Sep. 18, 2019) at 365:2-18 (docket no. 140). Eko Brands marked for identification, but did not offer, Exhibit 129, which reports market shares for the year ending January 26, 2019. Even if such evidence had been admitted, it would not have supported Eko Brands' assertion of irreparable harm because it indicates that, while ARM's share remained fairly steady, Eko Brands lost considerable ground to Keurig. In other words, Exhibits 80 and 129 suggest that defendants' infringement did not cause Eko Brands' loss of sales during the three-year period (February 25, 2016 - January 29, 2019) shortly preceding trial in this matter. The Court therefore concludes that no purpose would be served by allowing Eko Brands to supplement the record or present further argument in support of its request for injunctive relief.





1    $4.4 million, $3 million, and $2.7 million, respectively. *See* Ex. 274; Tr. (Sep. 18, 2019)

2    at 369:21-22 (docket no. 140). Although the figures decreased over the three-year span,

3    the sheer quantity of sales belies any sense that Eko Brands has suffered irreparable harm

4    to its reputation or goodwill. Moreover, to the extent confusion between EKOBREW and

5    defendants' "ECO" marks has occurred, Eko Brands has not identified any comments

6    that were derogatory of the parties' respective products nor proven that any EKOBREW

7    customer was lost to ARM. *See* *San Miguel*, 625 Fed. App'x at 327. Eko Brands has not

8    shown that defendants' attempt to exploit the early success of the EKOBREW Marks has

9    caused Eko Brands to lose control over its reputation or impacted Eko Brands' goodwill

10    in a manner that has not been compensated by monetary relief.

11        65.    Eko Brands has, however, demonstrated a significant risk that defendants

12    will continue to engage in infringing conduct and that, if defendants are not restricted in

13    some manner with respect to the use of "ECO" in their marks, the parties will continue to

14    be embroiled in litigation until one or the other or both of them are driven out of business.

15    *See* *Anhing Corp. v. Thuan Phong Co.*, 2015 WL 4517846 at *24 (C.D. Cal. July 24,

16    2015) (observing that injunctive relief avoids giving an infringer "a judicially imposed

17    compulsory license" and alleviates the burden on the trademark owner of "filing

18    duplicative lawsuits"). This prospect establishes a form of irreparable injury, as well as

19    the inadequacy of damages alone. It also tips the balance of hardships in favor of some

20    injunctive relief and indicates that the public interest in avoiding market confusion and

21    efficiently expending judicial resources will be served by limiting defendants' conduct.

22    The Court therefore concludes that a permanent injunction is appropriate, but it must be

23

tailored much more narrowly than Eko Brands has proposed.  In determining the scope of injunctive relief, the Court may consider a number of factors, including (i) the nature of the interest to be protected, (ii) the nature and extent of the wrongful conduct, (iii) the relative harm likely to result to the legitimate interests of the parties if an injunction is granted or denied, and (iv) the practicality of framing and enforcing an injunction.  *See Quiksilver, Inc. v. Kymsta Corp.*, 360 Fed. App'x 886, 889-90 (9th Cir. 2009); *see also* Restatement (Third) of Unfair Competition § 35 (1995) (cited in *Quiksilver*).

66.　　Given (i) the relative weakness of the EKOBREW Marks, and the long period of coexistence in the market, during which only three isolated instances of confusion have been identified, and (ii) defendants' extension of the "ECO" line of marks (from ECO FILL to ECO CARAFE and ECO-FLOW) during a time when Eko Brands had not yet been successful in registering the EKOBREW Marks, Eko Brands' proposal to preclude defendants from using, in connection with coffee products, "ECO" or "EKO" alone or in combination with other words or symbols in a service mark, trademark, trade name, or domain name is overly broad.  A permanent injunction containing these terms (iii) would likely signal the death knell of ARM's business involving reusable filters and related products, while having minimal or no positive effect on Eko Brands' market position, and (iv) might be difficult to enforce in light of the myriad ways in which the letters "ECO" or "EKO" could be incorporated into brands or website addresses without connoting the environmental conscientiousness underlying the EKOBREW Marks, for example, ECONOMY, EKOCHAMBER (a phonetic equivalent of "echo chamber"), BEKON (a phonetic equivalent of "beckon"), DÉCOR, RECOVER, or ZYDECO.

67.     Although Eko Brands has offered no alternative to its blanket ban on all things "ECO," the Court is able to craft a more limited permanent injunction that strikes the proper balance between Eko Brands' right to use its EKOBREW Marks without fear of consumer confusion and defendants' interests in continuing to compete in the reusable beverage filter industry.  Eko Brands' request for a permanent injunction is therefore GRANTED in part and DENIED in part as follows.  Defendants ARM and Adrian Rivera are permanently enjoined from using, in connection with coffee products, marks similar to the EKOBREW Marks in a manner that is likely to cause confusion concerning the source of the goods.  Defendants may not use "EKO" as the initial letters of a mark, but they may continue to use "ECO" as a prefix or other component of a mark, provided they include in close proximity another trademark or trade name that makes clear the source of the product.  To comply with this directive, defendants may combine their "non-ECO" and "ECO" marks or logos in a variety of ways, for example, "ECO FILL, a product of Adrian Rivera Maynez Enterprises, Inc.," "ECO FILL from PERFECT POD," or perhaps a mix of designs, as follows:



Defendants are not required to adopt any of these suggestions, but they must deploy at least one "non-ECO" brand or business identifier in connection with each "ECO" mark

as a method of substantially reducing or eliminating the likelihood of confusion with the EKOBREW Marks.

68.     Defendants shall modify their website and all electronic marketing means accordingly within six (6) weeks after entry of judgment in this matter, but defendants will be allowed to use their current supply of printed advertising materials and to sell off their existing inventory of "ECO" products through June 30, 2020.  Any "old ECO logo" advertising materials or products remaining after the sell-off period shall be immediately destroyed.  This permanent injunction shall be binding on defendants and all of their officers, agents, and employees, as well as on all persons who are in active concert or participation with defendants and have received actual notice of this permanent injunction.  The terms of this permanent injunction shall be set forth in the Judgment to be entered by the Clerk.  Defendants shall provide a copy of the Judgment to their officers, agents, and employees, and to any package, label, or logo designers or graphic artists working on a contract basis with defendants.  If, after the sell-off period, any manufacturing facilities, warehousing companies, shipping entities, wholesalers, distributors, retailers, or licensees are in possession of "old ECO logo" advertising materials, packaging, labels, and/or products, defendants shall provide a copy of the Judgment to such persons.  By July 15, 2020, defendants shall file a status report, verified by a sworn declaration, indicating the steps they have taken to comply with the permanent injunction.  Eko Brands may, but is not required to, file a response to the status report within fourteen (14) days after it is filed.  The Court will retain jurisdiction

in this matter until further order for purposes of determining whether defendants have complied with the terms of the permanent injunction.

69.     For the foregoing reasons, Eko Brands' separate request to cancel Certificates of Registration Nos. 4,239,190 (ECO FILL), 4,796,840 (ECO CARAFE), and 5,741,858 (ECO FILTER) is DENIED.[20]

## **Conclusion**

70.     The Court's Findings of Fact and Conclusions of Law are summarized as follows:

a.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1338;

b.     The EKOBREW Marks are valid because they are either inherently distinctive or they have acquired secondary meaning, and Eko Brands owned the EKOBREW Marks before defendants began using ECO FILL;

c.     Defendants' use of ECO FILL, ECO CARAFE, ECO-FLOW, ECO FILTER, ECOSAVE, and ECO-PURE on products similar to those sold by Eko Brands under the EKOBREW Marks is likely to cause confusion about the source of the respective goods;

d.     Defendants' adoption of the ECO FILL mark, the first of their "ECO" style marks, was willful;

e.     In light of Eko Brands' award of royalties in the parties' earlier patent litigation, Eko Brands is not entitled to disgorgement of defendants' profit

---

[20] Eko Brands seeks an order "cancelling" ARM's pending applications to register ECOSAVE and the ecosave design.  The Court is without jurisdiction to grant such relief.  *See Whitney Info. Network, Inc. v. Gagnon*, 353 F. Supp. 2d 1208, 1211 (M.D. Fla. 2005); *GMA Accessories, Inc. v. Idea Nuova, Inc.*, 157 F. Supp. 2d 234, 241 (S.D.N.Y. 2000); *see also* 15 U.S.C. § 1119.

associated with products bearing the marks ECO FILL DELUXE, ECO FILL DELUXE 2.0, or ECO-FLOW during the period from April 2, 2015, through June 8, 2018;

f.   Eko Brands is not entitled to disgorgement of any of defendants' profit in connection with ECO FILL DELUXE 2.0 (or ECO FILL 2.0) because defendants carried their burden of proving that such profit is attributable to a factor other than trademark infringement or unfair competition, namely the ECO FILL 2.0 product's compatibility with the Keurig® 2.0 machine;

g.   Eko Brands is not entitled to disgorgement of defendants' profit for the period from August 1, 2019, to the present because it did not satisfy its burden of proving gross revenue;

h.   On Claim 2, Eko Brands is not entitled to disgorgement of defendants' profit related to the ECO CARAFE product (a net of $822,290 in 2015) because it did not contemporaneously have a competing carafe-size filter;

i.   Eko Brands is entitled to the following amounts, reflecting the profit to be disgorged by defendants:

Claim 1 (trademark infringement)     $ 134,040

Claim 2 (unfair competition)         $ 515,148

                          TOTAL:     $ 649,188

Eko Brands has withdrawn its earlier request for prejudgment interest; *see* Pla.'s Resp. at 121-22 (docket no. 148);

j.   Eko Brands' request for a permanent injunction is GRANTED in part and DENIED in part; and

k.  Eko Brands' request to cancel the federal registrations for ECO FILL, ECO CARAFE, and ECO FILTER is DENIED.

71.  Defendants' motion for judgment, docket no. 125, is GRANTED in part and DENIED in part as set forth in these Findings of Fact and Conclusions of Law.

72.  The Clerk is DIRECTED to enter judgment consistent with these Findings of Fact and Conclusions of Law and to send a copy of the Judgment and these Findings of Fact and Conclusions of Law to all counsel of record. Eko Brands may tax costs in the manner set forth in Local Civil Rule 54(d), and any motion for attorney's fees shall be filed by the deadline specified in Federal Rule of Civil Procedure 54(d)(2)(B).

IT IS SO ORDERED.

Dated this 30th day of January, 2020.

Thomas S. Zilly
United States District Judge